UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HELIFLITE SHARES, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>TOWN OF EAST HAMPTON, TOWN BOARD OF THE TOWN OF EAST HAMPTON, and KATHEE BURKE-GONZALEZ in her official capacity as East Hampton Town Supervisor,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff HeliFlite Shares, LLC ("HeliFlite"), by its undersigned attorneys, for its Complaint against Defendants Town of East Hampton (the "Town"), Town Board of the Town of East Hampton (the "Town Board"), and Kathee Burke-Gonzalez in her official capacity as East Hampton Town Supervisor (the "Supervisor" and, collectively with the Town and Town Board, "Defendants"), alleges as follows:

## INTRODUCTION

1. HeliFlite brings this action to prevent Defendants from unlawfully downsizing East Hampton's public airport, reducing usable ramp capacity and after-hours access, and excluding HeliFlite from the facilities and services needed to continue its Airport business. HeliFlite has operated helicopters to and from East Hampton Airport (the "Airport") for more than two decades. The Executive Terminal serves not only HeliFlite but also twelve tie-down tenants and additional transient aircraft during the summer. Defendants' eviction of Long Island Airline, LLC ("LIA"), the fixed-base operator ("FBO") serving that terminal, and closure of the terminal and its ramp would eliminate an operating facility, displace based aircraft, and concentrate traffic at the

remaining facilities under restrictive ramp requirements. HeliFlite seeks declaratory and injunctive relief preserving its existing operational access and preventing those restrictions on its Stage 2 aircraft operations from taking effect without the process federal law requires.

2. HeliFlite operates Stage 2 aircraft. The Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. §§ 47521–47534, and the Federal Aviation Administration's ("FAA") implementing regulations require advance notice, analysis, and an opportunity for comment before a covered Stage 2 noise or access restriction may be implemented. 49 U.S.C. § 47524(b); 14 C.F.R. Part 161, Subpart C. The required notice and analysis must be completed at least 180 days before the restriction becomes effective. 14 C.F.R. § 161.203(a). Defendants have not completed that process for the restrictions challenged here.

3. Defendants cannot evade ANCA by accomplishing through proprietary and contractual measures what they could not accomplish through a curfew or access ordinance imposed without the required federal procedures. Closing the Executive Terminal and ramp would deprive HeliFlite of hangar space, passenger facilities, parking, and ground handling. LIA did not provide fueling. Its terminal and ramp did, however, support safe operations and services outside the Town's published 10:00 p.m.–7:00 a.m. interval. Removing that actual after-hours access would turn the published limitation into a practical restriction on operations that can presently continue. Closure would also displace based and transient aircraft and increase competition for the remaining ramp positions. Application of Town Code § 75-12's passenger-handling shutdown requirement in that setting would further restrict the Stage 2 operations that can be accommodated.

4. This is not the first time Defendants have attempted to curtail Airport operations without ANCA compliance. In 2015, the Town adopted a mandatory nighttime curfew, an extended curfew, and a one-trip-per-week limit on aircraft the Town classified as "Noisy Aircraft,"

a category that included every helicopter in HeliFlite's fleet at that time. HeliFlite and other Airport users sued. The Second Circuit held that plaintiffs were likely to succeed on their ANCA challenge, affirmed preliminary relief against the flight-frequency limit, and reversed the denial of preliminary relief against the curfews. *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 147–52, 155 (2d Cir. 2016). Separately, HeliFlite and other Airport users pursued FAA proceedings concerning the Town's grant-assurance obligations.

5. The Town tried again in 2022. The Town Board adopted resolutions to deactivate the Airport as a public-use facility and reopen it as a private, permission-required airport, without ANCA compliance, and rewrote the Airport Code to implement that change. State courts rejected the conversion for failure to comply with ANCA and held the Town in civil contempt for violating injunctive mandates. The Second Department sustained the ANCA ruling and contempt findings concerning closure and use restrictions, while modifying the injunction and contempt relief. *Matter of E. End Hangars, Inc. v. Town of E. Hampton*, 225 A.D.3d 861, 863–65 (2d Dep't 2024); 225 A.D.3d 865, 868–70 (2d Dep't 2024). The Airport's public-use status was restored in February 2025, and the Town restored its prior, detailed Airport Code in March 2026.

6. The current dispute is the Town's latest effort to curtail Airport operations through terminal closure and operating restrictions. A warrant dated August 26, 2025 directs removal from the Executive Terminal, and the Suffolk County Sheriff served a 14-day eviction notice on October 14, 2026, permitting removal after the notice period expires on or about October 28, 2026. HeliFlite intends to initiate a proceeding before the FAA under 14 C.F.R. Part 161 challenging the present curtailment of Airport access should the parties be unable to resolve this dispute amicably. That administrative avenue does not provide the immediate relief needed before the Executive Terminal is closed. HeliFlite now seeks emergency judicial protection of its existing operations

while this action is adjudicated. It does not seek appellate review of the state lease rulings or the dismissal of its Article 78 proceeding. It challenges the Town's implementation of restrictions on covered aircraft operations without ANCA compliance.

## THE PARTIES

7. Plaintiff HeliFlite Shares, LLC is a Delaware limited liability company with a principal office at 165 Western Road, Kearny, New Jersey 07032. Founded in 1998, HeliFlite provides on-demand helicopter charter services throughout the Northeast and manages a fractional aircraft ownership program. It holds Part 135 certification from the Federal Aviation Administration ("FAA") and interstate air transportation authorization from the United States Department of Transportation. Its fleet includes Sikorsky S-76 and Agusta/Leonardo AW139 helicopters. HeliFlite operates Stage 2 aircraft under the FAA's noise-classification system, and its affected operations are covered by ANCA and Subpart C of Part 161. HeliFlite employs 51 people and uses the Airport extensively for intrastate and interstate passenger transportation. It will be directly injured by the restrictions alleged here.

8. Defendant Town of East Hampton (the "Town") is a municipal corporation organized under the laws of the State of New York, located on the east end of Long Island. The Town owns and operates the Airport, a public-use general aviation airport in Wainscott, New York.

9. Defendant Town Board of the Town of East Hampton (the "Town Board") is the Town's governing legislative body and the body that has adopted the resolutions, Local Laws, and other actions described in this Complaint.

10. Defendant Kathee Burke-Gonzalez is the East Hampton Town Supervisor and is sued solely in her official capacity. In June 2024, HeliFlite's Chief Executive Officer, Kurt Carlson, met with her and requested that HeliFlite be permitted to provide FBO services if LIA ceased operating the Executive Terminal. HeliFlite formally renewed that request on October 26,

2026. The Supervisor responded on October 28, 2026, offering to explore a second FBO subject to stated conditions, but no replacement operating arrangement is in place at the Executive Terminal.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action presents a federal question concerning preemption of Defendants' restrictions under ANCA, 49 U.S.C. §§ 47521–47534, and its implementing regulations, 14 C.F.R. Part 161. HeliFlite seeks prospective equitable relief against implementation of those restrictions in violation of federal law.

12. This Court has personal jurisdiction over Defendants because the Town and Town Board are governmental entities located within this District, and the Supervisor is sued in her official capacity for acts and omissions in the exercise of municipal authority within this District.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants reside in this District and because a substantial part of the events or omissions giving rise to HeliFlite's claims occurred in this District, including at the Airport in Wainscott, New York.

14. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202 and prospective relief in equity against local restrictions preempted by federal law, with temporary and preliminary relief governed by Federal Rule of Civil Procedure 65. In *Friends*, the Second Circuit recognized an aircraft operator's ability to seek prospective equitable relief against the Town's ANCA-preempted restrictions without first exhausting an FAA administrative remedy. 841 F.3d at 143–47.

## PERTINENT LAW

### A. The Airport Noise and Capacity Act

15. Federal law governs aircraft operations and constrains local noise and access restrictions, while preserving a defined role for airport proprietors. A local government's

ownership of an airport does not excuse compliance with applicable federal law. Proprietary restrictions must be reasonable, nonarbitrary, and nondiscriminatory, and covered noise and access restrictions must also satisfy ANCA's procedural requirements.

16. The Airline Deregulation Act generally preempts local provisions related to an air carrier's price, route, or service while preserving an airport proprietor's proprietary powers and rights. 49 U.S.C. § 41713(b)(1), (3). Those proprietary powers do not displace ANCA's separate procedural requirements. Section 41713 supplies the proprietor-authority framework; the preemption claims asserted in this Complaint arise under ANCA and Part 161, not a separate ADA cause of action.

17. Congress enacted ANCA to establish a national aviation noise policy and address uncoordinated local restrictions that could impede the national air transportation system. 49 U.S.C. §§ 47521–47524. The FAA promulgated Part 161 to implement that framework. HeliFlite's claims concern restrictions on its Stage 2 operations and the procedures prescribed by 49 U.S.C. § 47524(b) and 14 C.F.R. Part 161, Subpart C.

18. An airport operator may not implement a Stage 2 restriction within Subpart C unless it provides an analysis prepared in accordance with 14 C.F.R. § 161.205 and public notice and an opportunity for comment under § 161.203. The required notice and analysis must be completed at least 180 days before the restriction takes effect. 14 C.F.R. § 161.203(a); 49 U.S.C. § 47524(b). Defendants have not completed that process for the challenged restrictions. HeliFlite's claim concerns those mandatory procedures, not a requirement that the FAA approve a Stage 2 restriction in advance.

19. Part 161's definition of noise or access restrictions includes restrictions implemented through ordinances, regulations, leases, and airport-use agreements, including limits

on the number or hours of covered operations. 14 C.F.R. § 161.5. Section 161.7(a) subjects otherwise excluded noise-abatement procedures, including taxiing and engine runups, to Part 161 where they limit the total number or hours of Stage 2 operations. HeliFlite challenges the additional limits on its Stage 2 operations produced by terminal and ramp closure, loss of actual after-hours access, and application of § 75-12 in the resulting reduced-facility setting.

### B. East Hampton Town Code § 75-12 and Related Operating Requirements

20. Town Code § 75-12, restored by Local Law No. 4-2026, provides: "Unless otherwise approved by the airport manager, passengers must be enplaned and deplaned in designated areas with aircraft engines shut off." The Town's July 17, 2026 JPX Operating Procedures memorandum directs operators to limit ramp engine run time for environmental and noise considerations, limits auxiliary power unit run time to thirty minutes, and refers to Code penalties. The Second Claim concerns the additional operational-capacity restriction caused by application of § 75-12 after terminal and ramp capacity are eliminated.

21. Section 75-12's engine-shutdown language was in effect in identical form before the Town's 2022 Airport Code revision. Since 2022, HeliFlite's customers have frequently complained of delays associated with implementation of the engine-shutdown requirement. Carlson is unaware of any published standard governing when the airport manager will grant or deny an exception. The airport-manager approval provision does not establish that an exception will preserve HeliFlite's operations in the reduced-space environment alleged here.

## PERTINENT FACTS

### A. The Airport and Its Operators

22. Until the Town's May 19, 2022 attempted conversion of the Airport to private use, the Airport's FAA location identifier was "HTO." Upon that conversion, the FAA assigned the Airport the private-use identifier "JPX," which the Airport has retained even after the Town

restored the Airport's public-use status in February 2025; the Town's current operating publications, including the JPX Operating Procedures memorandum, accordingly refer to the Airport by that newer identifier.

23. The Airport has two FBOs: LIA, which has operated at the Executive Terminal at 50 Industrial Road, Wainscott, New York since 1996, and Sound Aircraft Services, Inc. ("Sound"). The Executive Terminal's associated ramp is referred to herein as the "Executive Ramp." HeliFlite operates from the Executive Terminal as a subtenant and depends on its hangar space, passenger facilities, parking, and ground handling. LIA operates the terminal and Executive Ramp for general-aviation users, including HeliFlite, twelve tie-down tenants, and additional transient aircraft during the summer. Sound operates the other FBO and does not service the Executive Terminal. Closing the Executive Terminal and Executive Ramp would eliminate that operating facility and leave Sound as the sole remaining FBO.

24. The Airport is HeliFlite's most important destination. In 2025, HeliFlite flew 1,342 flights to or from the Airport, counting each landing and takeoff separately. Those operations represented between 20 and 23 percent of its total annual revenue, and approximately 87 percent occurred from May through September. In 2026 year-to-date, HeliFlite has had 1,840 Executive FBO operations, expected to account for between 22 and 25 percent of its full-year 2026 revenue, with approximately 89 percent occurring during the summer months. Of those 1,840 operations, 60 involved locations outside New York. HeliFlite offers a HeliCard prepaid flight-hour program and a fractional-ownership program, and many of those customers frequently travel to and from the Airport. Many customers own homes in East Hampton but work in New York City or elsewhere and use HeliFlite's services as their primary means of traveling to and from those homes.

25. HeliFlite requires its pilots to follow the Airport's noise-abatement procedures, including high-altitude approaches, climbing quickly to high altitude on departure, and avoiding rotor operation for more than five minutes on the ramp, except when directed otherwise by air traffic control or when weather-related safety conditions prevent compliance. HeliFlite maintains policies and procedures to monitor compliance, and Carlson personally performs that monitoring.

26. Sound currently advertises hours of 8:00 a.m. to 7:00 p.m. daily, with after-hours fuel inquiries available only by text message. Unlike the Executive Terminal, which has accommodated HeliFlite's aircraft without a reservation system, Sound allocates its limited ramp and parking positions through a Prior Permission Required ("PPR") system assigning specific arrival and departure windows, particularly during peak summer periods. HeliFlite has historically needed Sound's services infrequently. Based on its past experiences with Sound, Sound's limited ramp and parking capacity, and its assigned windows, HeliFlite does not expect Sound to accommodate its existing volume of peak-period operations in addition to Sound's current traffic. Without LIA's services or an adequate replacement at the Executive Terminal, HeliFlite cannot continue its existing Executive Terminal operations, including operations outside Sound's limited daytime hours.

27. The Executive Ramp has thirteen tie-down positions adjacent to the customer parking lot, which abuts the Executive Terminal's hangar. LIA serves twelve tie-down tenants and additional transient aircraft during the summer. Those general-aviation users are additional to HeliFlite's own operations described above.

28. The Town has made no relocation plan or equivalent accommodation for those users and ramp positions. If the based aircraft are moved to Sound's ramp, they will occupy positions now used by arriving and transient aircraft rather than replace the lost capacity. The

resulting loss limits the capacity available to accommodate HeliFlite's Stage 2 operations as well as other Airport traffic.

29. HeliFlite has sought an operating alternative rather than merely demand continuation of LIA's lease. After its June 2024 request, Carlson formally renewed HeliFlite's request by letter dated October 26, 2026, offering to provide full FBO services to all aircraft operators and Airport users independently of the outcome of the litigation. He explained that HeliFlite has the personnel, equipment, insurance, financial resources, and experience to provide those services, is prepared to meet reasonable minimum standards, and is willing to negotiate a lease or operating agreement on fair-market terms. He requested identification of the Town's minimum standards and available facilities and operating terms, a meeting, and a response by October 28, 2026. HeliFlite also requested forbearance from eviction pending negotiations. The Supervisor's October 28 response stated that the Town is "happy to explore HeliFlite serving as a second FBO" only if it changes its business model to serve all Airport operators, asserted that HeliFlite had not submitted an application satisfying the Town's minimum standards, and enclosed those standards. The response did not grant forbearance and stated that a second FBO "likely would not necessarily be based at the Executive Terminal," but elsewhere in the Airport's northern portion. No replacement FBO arrangement is currently in place at the Executive Terminal. The continuing exclusive-rights obligation described below presents a distinct FAA issue; HeliFlite does not assert Grant Assurance 23 as a separate private judicial cause of action in this Complaint.

**B. The 2015 Curfew Restrictions and Litigation**

30. In 2015, in response to complaints from Town residents regarding aircraft noise, the Town enacted a mandatory nighttime curfew, an extended curfew applicable to aircraft meeting a Town-defined noise threshold, and a weekly flight-frequency limitation applicable to such aircraft. Every helicopter in HeliFlite's fleet was classified by the Town as a "Noisy Aircraft"

subject to the extended curfew and the flight-frequency limitation. HeliFlite, together with other Airport users and operators, including Sound, challenged those restrictions in this Court.

31. The Second Circuit held that plaintiffs were likely to succeed on their ANCA challenge. It affirmed the injunction against the weekly flight limit, reversed the denial of preliminary relief against the curfews, and remanded for further proceedings. *Friends*, 841 F.3d at 147–52, 155. The Town's status as airport proprietor did not excuse compliance with ANCA, and ANCA applied independently of eligibility for federal funding.

**C. The FAA Grant Assurance Proceeding (Docket No. 16-15-02)**

32. In January 2015, HeliFlite and other operators, together with Friends of the East Hampton Airport, Inc., filed an administrative complaint with the FAA, captioned *Friends of East Hampton Airport, Inc. et al. v. Town of East Hampton, NY*, FAA Docket No. 16-15-02, alleging that the Town had violated its federal grant assurance obligations, including by failing to maintain the Airport's runways and perimeter fence and by failing to use Airport revenues properly. On January 31, 2017, the FAA's Director of the Office of Airport Compliance and Management Analysis issued an initial determination finding the Town in violation of Grant Assurance 11, Grant Assurance 24, and Grant Assurance 25, and ordered the Town to submit a Corrective Action Plan. That determination was not appealed by either party and became final.

33. On December 1, 2023, the FAA issued a determination disposing of the remaining contested allegations. It dismissed allegations involving Grant Assurances 19, 20, 24, and 29 as moot because the relevant obligations expired September 25, 2021, and concluded that the revenue allegations had been addressed in the Town's 2017 corrective-action plan. The determination separately identified Assurances 23 (Exclusive Rights), 25 (Airport Revenues), and 30 (Civil Rights) as continuing while the facility operates as an airport. ANCA's procedural requirements apply independently of the Town's federal-funding eligibility.

**D. The Town's 2022 Attempt to Convert the Airport to Private Use**

34. On January 20, 2022, as amended February 17, 2022, the Town Board adopted resolutions authorizing deactivation of the Airport as a public-use facility on May 17, 2022 and reopening as a private-use, permission-required airport on May 19, 2022. On April 21, 2022, it adopted Local Law No. 11-2022, replacing the detailed Airport Code with an abbreviated chapter providing for a permission-only facility governed by separately maintained rules. Airport users challenged those actions in three related hybrid Article 78 proceedings and plenary actions. *Matter of E. End Hangars*, 225 A.D.3d at 863–65.

35. The Supreme Court, Suffolk County, entered injunctive relief against the Town's attempted conversion and later held the Town in civil contempt. On March 27, 2024, the Second Department sustained the determination that the Town's action was arbitrary and capricious and affected by an error of law because it failed to comply with ANCA, while modifying the injunction's scope. *Matter of E. End Hangars*, 225 A.D.3d at 863–65. In the companion appeal, it sustained contempt findings concerning closure and use restrictions, while rejecting other grounds and modifying the sanctions. 225 A.D.3d at 868–70.

36. On November 7, 2024, the Town requested restoration of the Airport's public-use status by filing FAA Form 7480-1. The FAA restored that status on February 20, 2025. On March 10, 2026, the Town Board adopted Local Law No. 4-2026, repealing the abbreviated 2022 Airport Code and restoring the prior, detailed Airport Code in substantially its earlier form, including § 75-12.

**E. The LIA Lease Termination and Litigation**

37. LIA separately litigated the Town's termination of its lease in *Long Island Airline, LLC v. Town of East Hampton*, Index No. 618836/2021 (Sup. Ct., Suffolk Cnty. Apr. 19, 2022). By order dated April 19, 2022, the court found that LIA had committed an incurable material

breach of its lease and denied LIA's request for a *Yellowstone* injunction; that order was affirmed on appeal, and the New York Court of Appeals denied leave to appeal. The Town served a Notice of Termination on LIA on or about February 12, 2024, and commenced an eviction proceeding in the Town of East Hampton Justice Court on or about February 26, 2024.

38. In *Town of East Hampton v. Long Island Airline LLC f/k/a Aviation Resources Inc. et al.*, Index No. LT 30281/2024, the Justice Court's August 1, 2025 decision awarded the Town possession. A warrant dated August 26, 2025, commands the Suffolk County Sheriff to remove LIA and fictitiously named corporate and individual respondents from the entire Executive Terminal premises and put the Town in possession. The Appellate Term dismissed LIA's appeal from the August 1 decision on December 22, 2025. On October 14, 2026, the Sheriff served a 14-day eviction notice accompanied by the warrant, permitting removal without further notice after the notice period expires on or about October 28, 2026. Execution threatens removal of HeliFlite, its personnel, aircraft, equipment, and other property and the interruption of its Airport operations.

**F. HeliFlite's Article 78 Proceeding and Its Dismissal**

39. HeliFlite separately commenced a proceeding under Article 78 of the New York Civil Practice Law and Rules, captioned *Matter of the Application of HeliFlite Shares, L.L.C. v. Town of East Hampton*, Index No. 612657/2024 (Sup. Ct., Suffolk Cnty.). A stay entered by order to show cause dated November 12, 2025, protected HeliFlite's continued occupancy and operations at the Executive Terminal while that proceeding was pending.

40. By decision and order dated September 21, 2026, and filed September 24, 2026, the Supreme Court, Suffolk County, denied HeliFlite's petition, dismissed the proceeding, vacated the November 12, 2025 stay, and directed submission of a judgment on notice. The court determined that the lease-termination issue had already been decided and was dispositive of the petition. This action does not seek review or reversal of that determination or adjudication of LIA's

entitlement to a renewed lease. It challenges the additional restriction of Stage 2 operations through loss of ramp capacity and actual after-hours access.

41. After vacatur of the stay, HeliFlite continued its actual Airport operations. On October 2, 2026, the Town took physical measures to restrict access to the Executive Terminal and Executive Ramp, directing one HeliFlite flight's passenger pickup to the main terminal. The Town subsequently said the blockage was a mistake and allowed access to resume. The incident interrupted HeliFlite's established access even though the runway remained open and demonstrates the practical consequences of physical exclusion.

42. The October 14, 2026 Sheriff's notice supplied a concrete period for removal after the September decision. HeliFlite seeks protection before physical displacement interrupts its continuing operations.

### G. The Current Nighttime Curfew and the Town's Published Operating Materials

43. The Town's July 17, 2026 JPX Operating Procedures memorandum states: "Nighttime Curfew: 10pm to 7am." That interval encompasses nine hours each day.

44. The Town's Airport Information sheet, dated May 11, 2026, states, in the Town's own words: "Curfew: All Aircraft—Nighttime Curfew: 10:00pm to 7:00am. No FBO services available during those hours." The Town's Helicopter Arrival and Departure Routes publication separately confirms that "no ramp services are available" during the same hours. Both publications predate the eviction notice at issue in this action by several months, and neither is phrased as aspirational or voluntary.

45. Despite the published language, LIA and the Executive Terminal have actually supported safe operations and services outside the stated 10:00 p.m.–7:00 a.m. interval, including aircraft parking and ground handling. Closure would eliminate that actual access and make the

published nighttime limitation an effective restriction on operations that can presently continue. Without LIA's services or an adequate replacement at the Executive Terminal, HeliFlite would lose the parking, passenger facilities, and ground handling enabling its existing operations, including flights outside Sound's limited daytime hours. An open runway alone would not replace those facilities and services.

46. Aircraft arriving after 10:00 p.m., including arrivals delayed by weather or air-traffic instructions, require usable parking and ground-handling arrangements for safe passenger access and aircraft movements. Eliminating the Executive Terminal's actual services would leave affected aircraft without the arrangements that have allowed those flights to continue. The injury includes operational safety and reliable access, not merely passenger inconvenience.

### H. Defendants' Conduct Restricts HeliFlite's Covered Aircraft Operations Without ANCA Compliance

47. Defendants have not completed the notice, analysis, and opportunity for comment required by 49 U.S.C. § 47524(b) and Subpart C of Part 161 for the challenged restrictions on HeliFlite's Stage 2 operations. They have not provided the required analysis of the access and capacity restrictions, evaluated alternatives through the prescribed process, or completed the required notice and analysis at least 180 days before implementation. The published curfew has not undergone that process. Defendants may not give it compulsory effect over HeliFlite's Stage 2 operations, including through elimination of actual after-hours services, without the required compliance.

48. Defendants' termination of LIA's lease, pursuit of eviction, and closure of the Executive Terminal and Executive Ramp would remove facilities and services necessary for HeliFlite's Stage 2 operations and eliminate thirteen tie-down positions serving twelve tie-down tenants and additional transient aircraft. Aircraft relocated to Sound's ramp would occupy

positions presently used by arriving and transient aircraft, reducing capacity available for HeliFlite's operations as well as other traffic. Loss of actual nighttime parking and handling would separately prevent flights presently accommodated outside the published interval. The resulting access and capacity limits constitute a noise or access restriction under 14 C.F.R. § 161.5 notwithstanding their implementation through property and facility measures rather than a new curfew ordinance.

49. After closure, applying § 75-12's engine-off passenger-handling requirement at the remaining facilities would require HeliFlite's Stage 2 helicopters to occupy limited ramp positions throughout shutdown and restart cycles. Relocation of based aircraft from the Executive Ramp would further reduce positions available for arriving and transient aircraft. Together, those measures would lengthen turnaround times and reduce the number of Stage 2 operations that can be accommodated, particularly during peak periods. The additional limitation is subject to § 161.7(a) and has not undergone the required Subpart C process.

50. The restriction alleged here is the present loss of usable ramp capacity and actual operating access, not simply a new characterization of the previously adjudicated lease dispute. Defendants' description of their actions as facility or property management does not alter the resulting limitation on HeliFlite's Stage 2 operations.

**I. This Action Does Not Require Adjudication of LIA's Lease Rights**

51. HeliFlite seeks protection of its own operating access, personnel, aircraft, equipment, and property, not adjudication of LIA's right to a renewed lease. Closing the terminal and ramp directly removes the facilities and services HeliFlite uses, while relocating other based aircraft consumes space needed for its flights. Defendants have already temporarily blocked access and caused a passenger pickup to be diverted, demonstrating HeliFlite's direct operational injury. HeliFlite seeks preservation of its actual access and after-hours service arrangements and

protection against the additional § 75-12 capacity restriction. The requested operational relief does not require a determination that LIA is entitled to a permanent tenancy.

**J. HeliFlite Will Suffer Immediate and Irreparable Harm**

52. Unless restrained, Defendants' actions following expiration of the current notice period will deprive HeliFlite of the facilities needed to continue its Airport business. HeliFlite anticipates an approximately 50 percent decline in Airport operations and total revenue for 2027 that is 10–15 percent lower than projected absent eviction, with substantially greater revenue loss if Sound cannot fully accommodate its volume. HeliFlite would likely have to reduce its fleet by approximately 3–4 helicopters and lay off 10–12 full-time employees. Even if access were later restored, highly skilled employees would be difficult to replace, as would helicopters meeting HeliFlite's criteria for high-quality, used aircraft with a single prior owner. Nearby airports cannot adequately mitigate the injury because of their location, capacity, operating hours, and service limitations. Requiring customers to land farther from East Hampton and travel on congested roads would undermine HeliFlite's traffic-avoidance benefit, and many customers would likely forgo flying. Loss of reliable Airport service would cause lasting injury to established customer relationships, goodwill, and operational continuity, not merely lost revenue from individual flights.

53. This harm will occur imminently and cannot be remedied by a later award of money damages, because HeliFlite's loss of access to the Executive Terminal will cause HeliFlite to lose customer relationships, goodwill, and operational continuity that cannot be restored after the fact.

# CLAIMS FOR RELIEF

## First Claim for Relief

### Declaratory and Injunctive Relief: ANCA and Part 161 Preemption (Terminal Closure and Operational Access Restrictions)

54. HeliFlite repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

55. ANCA and Part 161 preempt covered restrictions on HeliFlite's Stage 2 operations imposed without the advance notice, analysis, opportunity for comment, and timing requirements of 49 U.S.C. § 47524(b) and Subpart C of Part 161. Those requirements apply to restrictions implemented through leases, airport-use arrangements, and facility decisions as well as ordinances and posted operating rules. The required notice and analysis must be completed at least 180 days before a covered restriction takes effect.

56. Eliminating the Executive Terminal, its ramp positions, and its parking and ground-handling services deprives HeliFlite of the facilities required for its Stage 2 operations. Displacing tie-down tenants to Sound's ramp further consumes positions available for HeliFlite and transient traffic. Closure would also eliminate actual after-hours access and give the Town's published 10:00 p.m.–7:00 a.m. limitation compulsory effect over operations presently accommodated. Those additional limits on access, capacity, and operating hours constitute a noise or access restriction under 14 C.F.R. § 161.5 regardless of their implementation through termination, eviction, facility closure, or posted service limits.

57. Defendants have not completed the required Stage 2 analysis, public notice, and opportunity for comment, including the requirement that notice and analysis be completed at least 180 days before implementation. The challenged restriction therefore may not lawfully be

implemented against HeliFlite's Stage 2 operations without compliance with 49 U.S.C. § 47524(b) and 14 C.F.R. Part 161, Subpart C.

58. Defendants' ownership of the Airport and authority over leases do not dispense with ANCA's procedural requirements for the covered restriction alleged here. HeliFlite's interstate charter operations are directly affected by that restriction. Unless enjoined, Defendants' actions will imminently exclude HeliFlite from its operating facilities and cause the operational and goodwill injuries described above.

59. HeliFlite is entitled to a declaration that Defendants' implementation of the challenged terminal-closure, ramp-capacity, and after-hours access restriction without the required Stage 2 process is preempted by ANCA and Part 161. It is entitled to temporary, preliminary, and permanent relief preventing Defendants from taking action that would alter its existing operations or cause removal of HeliFlite, its personnel, aircraft, equipment, or other property from the Executive Terminal or Executive Ramp; from closing, decommissioning, demolishing, or repurposing those facilities so as to prevent its existing operations; from blocking its established access; or from terminating its existing parking, passenger-handling, and actual after-hours ground-handling access and arrangements. The requested protection is subject to applicable FAA safety requirements and continues unless and until the challenged restriction may lawfully be implemented following the applicable ANCA process. HeliFlite does not seek to vacate the warrant against LIA, restore LIA's tenancy, or adjudicate the lease rights determined in the state proceedings.

<u>**Second Claim for Relief**</u>

**Declaratory and Injunctive Relief: ANCA and Part 161 Preemption**
**(Town Code § 75-12 as Applied)**

60. HeliFlite repeats and realleges all preceding paragraphs of this Complaint as if fully set forth herein.

61. Defendants' application of § 75-12 after closure of the Executive Terminal and ramp will concentrate HeliFlite's passenger handling at the remaining facilities and require its Stage 2 helicopters to occupy limited positions during shutdown and restart cycles. Based aircraft relocated from the Executive Ramp will consume space otherwise available for arriving and transient traffic. Enforcing the passenger-handling shutdown requirement under those conditions will lengthen turnaround times and reduce the number of HeliFlite's Stage 2 operations that can be accommodated, including during peak periods, beyond the existing two-facility operating arrangements.

62. As applied in that setting, § 75-12 limits the number or hours of HeliFlite's Stage 2 operations and constitutes a noise or access restriction under 14 C.F.R. §§ 161.5 and 161.7(a). The challenged additional limitation results from eliminating terminal and ramp capacity and enforcing the passenger-handling shutdown requirement in the resulting operating environment, not merely from the unchanged existence of the Code text. Defendants have not completed the applicable Stage 2 notice, analysis, and comment process for that additional restriction.

63. HeliFlite is entitled to a declaration that Defendants' enforcement of § 75-12's passenger-handling shutdown requirement against its Stage 2 operations at the remaining facilities after closure of the Executive Terminal and ramp is preempted insofar as it imposes the additional operational-capacity restriction alleged above without the process required by 49 U.S.C. § 47524(b) and Subpart C of Part 161. It is entitled to temporary, preliminary, and permanent relief

against that application unless and until the additional restriction may lawfully be implemented after the required ANCA process.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff HeliFlite Shares, LLC respectfully requests that this Court enter judgment in its favor and against Defendants as follows:

(a) Declaring that Defendants' implementation of the challenged terminal-closure, ramp-capacity, and operational-access restriction, including giving the published nighttime limitation compulsory effect through elimination of actual after-hours services, without the required Stage 2 procedural compliance is preempted by 49 U.S.C. § 47524(b) and 14 C.F.R. Part 161, Subpart C;

(b) Declaring that Defendants' enforcement of § 75-12's engine-shutdown requirement for passenger enplaning and deplaning against HeliFlite's Stage 2 helicopters at the remaining facilities after closure of the Executive Terminal and ramp is preempted insofar as it imposes the additional capacity restriction alleged in the Second Claim without the required Stage 2 procedural compliance;

(c) Temporarily, preliminarily, and permanently enjoining Defendants, their officers, agents, employees, attorneys, and other persons properly bound under Federal Rule of Civil Procedure 65(d)(2) from: (i) taking any action that would alter HeliFlite's existing operations or cause the removal of HeliFlite, its personnel, aircraft, equipment, or other property from the Executive Terminal or Executive Ramp; (ii) closing, decommissioning, demolishing, or repurposing the Executive Terminal or Executive Ramp so as to prevent HeliFlite's existing operations, blocking HeliFlite's established access to those facilities, or terminating its existing parking, passenger-handling, and actual after-hours ground-handling access and

arrangements at those facilities; and (iii) enforcing Town Code § 75-12 by requiring engine shutdown for passenger enplaning and deplaning by HeliFlite's Stage 2 helicopters following closure of the Executive Terminal and Executive Ramp without compliance with 49 U.S.C. § 47524(b) and 14 C.F.R. Part 161, Subpart C, including the requirement that the prescribed notice and analysis be completed at least 180 days before the restriction takes effect. These restraints do not override applicable FAA safety requirements and are requested unless and until the challenged restrictions may lawfully be implemented. HeliFlite seeks preservation of its own existing access, operations, and property, not vacatur of the warrant against LIA, restoration of LIA's tenancy, or adjudication of the lease rights determined in the state proceedings;

(d) Awarding HeliFlite its costs and reasonable attorneys' fees to the extent permitted by law; and

(e) Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 28, 2026

DECHERT LLP

By: */s/ Randy M. Mastro*

Randy M. Mastro
randy.mastro@dechert.com
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: +1 212 698 3500
Facsimile: +1 212 698 3599

*Counsel for Plaintiff*