UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HELIFLITE SHARES, LLC,<br><br>Plaintiff,<br><br>-against-<br><br>TOWN OF EAST HAMPTON, TOWN BOARD OF THE TOWN OF EAST HAMPTON, and KATHEE BURKE-GONZALEZ in her official capacity as East Hampton Town Supervisor,<br><br>Defendants. | Civil Action No. 26-cv-6936 |

**PLAINTIFF HELIFLITE'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION BY ORDER TO SHOW CAUSE FOR EMERGENCY INJUNCTIVE RELIEF**

DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
(212) 698-3500

*Counsel for Plaintiff*

Dated: October 28, 2026

# TABLE OF CONTENTS


**Page**

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 5

A. The Parties and the Airport ........ 5

B. HeliFlite's Longstanding Operations at the Airport ........ 6

C. The Town's 2015 Curfew Restrictions and the *Friends* Litigation ........ 9

D. The FAA Grant Assurance Proceeding (Docket No. 16-15-02) ........ 9

E. The Town's 2022 Attempt to Convert the Airport to Private Use ........ 10

F. The LIA Lease Termination and Litigation ........ 11

G. HeliFlite's Article 78 Proceeding and Its Dismissal ........ 12

H. The Current Nighttime Curfew and the Town's Own Admissions Regarding FBO Availability ........ 12

I. Town Code Section 75-12 and Peak-Period Capacity ........ 13

J. The Imminent Eviction and Present Emergency ........ 13

ARGUMENT ........ 14

**I. The Standard for a Temporary Restraining Order and Preliminary Injunction** ........ 14

**II. ANCA and Part 161 Displace Local Control Over Noise and Access Restrictions on Covered Aircraft Operations** ........ 15

**III. HeliFlite Is Likely to Succeed on the Merits of Its ANCA Preemption Claims** ........ 17

A. Eliminating the Executive Terminal and Its Services Restricts HeliFlite's Access to the Airport ........ 17

B. Section 75-12, as Applied After Terminal Consolidation, Restricts Covered Operational Capacity ........ 19

**IV. The Court Can Adjudicate the Independent Federal Claims, Subject to the Limits Governing State-Court Enforcement** ........ 20

A. HeliFlite Has Standing to Bring This Action ........ 20

B. Proprietor Authority Does Not Excuse ANCA Noncompliance ........ 20

C. *Montauk-Caribbean Airways v. Hope* Does Not Bar This Action ........ 21

D. The Prior State Proceedings Do Not Foreclose Adjudication of HeliFlite's Independent Federal Claims ........ 23

E. This Action Is Neither Moot Nor Unripe ........ 24

**V. HeliFlite Will Suffer Immediate and Irreparable Harm Absent an Injunction** ........ 24

**VI. The Balance of Hardships and the Public Interest Favor an Injunction** ........ 26

**VII. The Court Should Preserve HeliFlite's Existing Operations Pending Adjudication** ........ 27

CONCLUSION ........ 28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3M Co. v. CovCare, Inc.*,
537 F. Supp. 3d 385 (E.D.N.Y. 2021) ....................25

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985)....................26

*Colorado River Water Conservation Dist. v. United States*,
424 U.S. 800 (1976)....................24

*County of Imperial v. Munoz*,
449 U.S. 54 (1980)....................23

*Delux Public Charter, LLC v. County of Westchester*,
No. 24-1895-cv (2d Cir. Aug. 26, 2025) (summary order)....................17, 18, 21

*Matter of E. End Hangars, Inc. v. Town of E. Hampton*,
225 A.D.3d 861 (2d Dep't 2024)....................4, 10–11, 17

*Matter of E. End Hangars, Inc. v. Town of E. Hampton*,
225 A.D.3d 865 (2d Dep't 2024)....................4, 11

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005)....................23

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
841 F.3d 133 (2d Cir. 2016).................... *passim*

*Friends of East Hampton Airport, Inc. et al. v. Town of East Hampton, NY*,
FAA Docket No. 16-15-02 ....................9–10, 14, 22

*Friends of the East Hampton Airport, Inc. v. Town of East Hampton*,
No. 15-cv-2246 (E.D.N.Y.) ....................9

*Hale v. Bimco Trading, Inc.*,
306 U.S. 375 (1939)....................23

*HeliFlite Shares, L.L.C. v. Town of East Hampton*,
Index No. 612657/2024 (Sup. Ct., Suffolk Cnty.)....................12, 23

*Hoblock v. Albany Cnty. Bd. of Elections*,
422 F.3d 77 (2d Cir. 2005)....................23

*Long Island Airline, LLC v. Town of East Hampton*,
Index No. 618836/2021 (Sup. Ct., Suffolk Cnty.) ..........11

*Mansfield Heliflight, Inc. v. City of Burlington, Vermont*,
FAA Docket No. 16-14-06, Director's Determination (Sept. 5, 2017), *aff'd*,
Final Agency Decision (June 22, 2018) ..........2, 22

*Montauk-Caribbean Airways, Inc. v. Hope*,
784 F.2d 91 (2d Cir. 1986) ..........21

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) ..........14–15

*Nat'l Helicopter Corp. of Am. v. City of New York*,
137 F.3d 81 (2d Cir. 1998) ..........15, 17, 20

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
704 F. Supp. 2d 305 (S.D.N.Y. 2010) ..........25

*Nken v. Holder*,
556 U.S. 418 (2009) ..........14

*Pennzoil Co. v. Texaco Inc.*,
481 U.S. 1 (1987) ..........24

*Smith v. Okaloosa County, Florida*,
FAA Docket No. 16-24-01, Director's Determination (Mar. 20, 2025) ..........2, 22

*Sprint Commc'ns, Inc. v. Jacobs*,
571 U.S. 69 (2013) ..........24

*TechnoMarine SA v. Giftports, Inc.*,
758 F.3d 493 (2d Cir. 2014) ..........24

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*,
60 F.3d 27 (2d Cir. 1995) ..........14, 25

*Town of East Hampton v. Long Island Airline LLC f/k/a Aviation Resources Inc. et al.*,
Index No. LT 30281/2024 (East Hampton Just. Ct.) ..........11, 13

*Whitfield v. City of New York*,
96 F.4th 504 (2d Cir. 2024) ..........23

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..........4, 14

*Yong Ki Hong v. KBS Am., Inc.*,
No. 05-CV-1177 ERKKAM, 2005 WL 1712236 (E.D.N.Y. July 22, 2005) ..........................25

**Statutes**

28 U.S.C. § 1738 ..........23

49 U.S.C. § 41713(b)(3) ..........21

49 U.S.C. § 47524(b) ..........2–3, 15, 21, 28–29

49 U.S.C. § 47533(1) ..........21

Airport Noise and Capacity Act of 1990, 49 U.S.C. §§ 47521–47534.......... *passim*

Town of East Hampton Local Law No. 11-2022..........10

Town Code § 75-12 .......... *passim*

Town Code § 75-20 ..........10, 13

**Regulations and Rules**

14 C.F.R. Part 161.......... *passim*

14 C.F.R. § 161.5 ..........3, 16, 18

14 C.F.R. § 161.716, 19, ..........21

14 C.F.R. §§ 161.201–161.215 (Subpart C) .......... *passim*

14 C.F.R. § 161.201 ..........15–16, 21

14 C.F.R. § 161.203 ..........2–3, 16, 19

14 C.F.R. § 161.205 ..........16

Federal Rule of Civil Procedure 65(d)(2) ..........27

## PRELIMINARY STATEMENT

This case seeks to prevent the Town of East Hampton, its Town Board, and Kathee Burke-Gonzalez in her official capacity as East Hampton Town Supervisor (collectively, "Defendants") from downsizing East Hampton Airport (the "Airport"), curtailing general-aviation access and capacity, and excluding HeliFlite Shares, LLC ("HeliFlite") from the facilities and services needed to continue its Airport business. HeliFlite has operated helicopters to and from the Airport for more than two decades. Absent this Court's immediate intervention, Defendants' unilateral actions threaten to disrupt HeliFlite's existing operations without the advance notice, analysis, and opportunity for comment required for restrictions on its Stage 2 aircraft operations. HeliFlite therefore seeks emergency relief preserving its existing operations during this action.

HeliFlite has previously challenged the Town of East Hampton's restrictions on access to its public airport in federal court and before the Federal Aviation Administration ("FAA"). The Town's authority as a local owner/operator remains subject to the Airport Noise and Capacity Act of 1990 ("ANCA"), 49 U.S.C. §§ 47521–47534, and the FAA's implementing regulations, 14 C.F.R. Part 161. Indeed, the Town even tried to close this public airport and reopen it for private use four years ago, only to be compelled by state courts to maintain its public-use status. But like *déjà vu* all over again, the Town is again seeking to reduce the scope and services at its public airport without complying with federal law. HeliFlite is therefore once again seeking emergency relief in federal court to prevent the threatened eviction of its terminal operator and closure of the Executive Terminal, which would disrupt HeliFlite's existing Airport operations.

At its core, this is a federal dispute: the Town's authority over airport access is constrained by Congress and the FAA. A covered local noise or access restriction imposed without the required federal procedures is preempted. Under the FAA's regulations implementing ANCA, before implementing such a Stage 2 restriction, the airport operator must provide an analysis, public notice, and an opportunity for comment, and the required notice and analysis "shall be completed

at least 180 days prior to the effective date of the restriction." 14 C.F.R. § 161.203(a); *see* 49 U.S.C. § 47524(b). The Town has not completed that process for the restrictions challenged here.

Moreover, the FAA has expressly and repeatedly recognized, in the closely analogous context of airport access for a second fixed-base operator, that a sponsor's exercise of its own proprietary and contractual authority, including approving lease assumptions, consolidations, or terminations that concentrate fixed-base operator ("FBO") access in a single operator, as here, can itself effect the kind of restriction that federal law governs, and that is preempted, absent compliance with the express procedures that Congress has prescribed. *See, e.g.*, *Smith v. Okaloosa County, Florida*, FAA Docket No. 16-24-01, Director's Determination at 17–21 (Mar. 20, 2025) (sponsor violated Grant Assurance 23, Exclusive Rights, by allowing one operator to control both of an airport's FBO facilities without seeking out other interested providers); *see also Mansfield Heliflight, Inc. v. City of Burlington, Vermont*, FAA Docket No. 16-14-06, Director's Determination (Sept. 5, 2017), *aff'd*, Final Agency Decision (June 22, 2018) (no violation where, unlike here, the sponsor had engaged with the prospective second operator and offered it a path to establish service).

The immediate emergency is the Town's pursuit of eviction and closure of the Executive Terminal, out of which HeliFlite has long operated. A warrant dated August 26, 2025 directs removal of Long Island Airline, LLC ("LIA") and other occupants, and the Suffolk County Sheriff served a 14-day eviction notice on October 14, 2026, permitting removal after expiration of the notice period on or about October 28, 2026. Mastro Decl. Ex. 4; HeliFlite Decl. Ex. 1. HeliFlite depends on the terminal's hangar space, passenger facilities, parking, and ground handling. HeliFlite Decl. ¶ 11. Closure would eliminate an operating terminal and ramp used by HeliFlite, twelve tie-down tenants, and transient aircraft, without a Town relocation plan or equivalent accommodation. *Id.* ¶¶ 13–14. That is a reduction in usable Airport access and capacity, not merely a change of landlord for one tenant.

Moreover, the Town's Airport Information sheet states: "Curfew: All Aircraft—Nighttime Curfew: 10:00pm to 7:00am. No FBO services available during those hours." HeliFlite Decl. Ex.

4. The Town's Helicopter Arrival and Departure Routes publication separately states that "no ramp services are available" during those hours. HeliFlite Decl. Ex. 3. In practice, however, LIA and the Executive Terminal have supported after-hours operations. HeliFlite Decl. ¶¶ 40–41. Sound, which would become the Airport's sole remaining FBO upon closure of the Executive Terminal, advertises hours of 8:00 a.m. to 7:00 p.m. and does not service the Executive Terminal. *Id.* ¶ 11. Closure would therefore deprive HeliFlite of the facilities and actual after-hours services on which its existing operations depend. *Id.* ¶ 50.

HeliFlite challenges the Town's ongoing curtailment of Airport access through termination of LIA's lease, closure of the Executive Terminal and ramp, elimination of actual after-hours services, and application of ramp requirements in the reduced-facility setting. Those measures restrict HeliFlite's Stage 2 operations without the advance notice, analysis, and opportunity for comment required by 49 U.S.C. § 47524(b) and Subpart C of Part 161. The airport operator "may not implement" a covered Stage 2 restriction unless it completes that process, including the 180-day advance requirement. 14 C.F.R. § 161.203(a). A restriction does not escape those requirements because it is implemented through a lease termination or posted operating rule; its effect on covered operations, not its form, governs. *Id.* § 161.5. HeliFlite intends to initiate a Part 161 proceeding before the FAA should the parties be unable to resolve this dispute amicably, but that administrative avenue does not provide the immediate relief HeliFlite requires before the Executive Terminal is closed. It seeks emergency judicial protection against implementation of the restrictions without the required process, so that it can continue its Airport operations while this action is adjudicated.

This is not the first time the Town has tried this kind of maneuvering to curtail its public airport's operations. In 2015, the Town adopted a mandatory nighttime curfew, an extended curfew, and a one-round-trip-per-week limit on aircraft the Town classified as "Noisy Aircraft." HeliFlite Decl. ¶ 15. HeliFlite and other Airport users sued, and the United States Court of Appeals for the Second Circuit held that they were likely to succeed in showing the restrictions were preempted because the Town had not undertaken ANCA's required procedures, and directed preliminary

injunctive relief. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 147–52, 155 (2d Cir. 2016). Separately, also in 2015, HeliFlite and other operators filed a federal grant-assurance complaint against the Town, and the FAA found the Town in violation of its grant assurance obligations relating to pavement maintenance and airport revenue. *See* Factual Background § D, *infra*.

Undeterred, the Town tried to curtail its public airport's operations again in 2022. The East Hampton Town Board adopted resolutions purporting to deactivate the Airport as a public-use facility and then reopen it as a private, permission-only airport, and it rewrote its Airport Code to match. *See* Factual Background § E, *infra*. When Airport users challenged that action in New York State Supreme Court, the trial court found the Town's conduct arbitrary, capricious, and unlawful, and later held the Town in civil contempt for violating injunctive mandates. The Appellate Division, Second Department, sustained the ANCA determination and contempt findings concerning closure and use restrictions, while modifying the injunction and contempt relief. *See Matter of E. End Hangars, Inc. v. Town of E. Hampton*, 225 A.D.3d 861, 863–65 (2d Dep't 2024); *Matter of E. End Hangars, Inc. v. Town of E. Hampton*, 225 A.D.3d 865, 868–70 (2d Dep't 2024). The Town was forced to reverse course, restoring the Airport's public-use status in February 2025. Thus, the Town's conduct challenged here continues its historical pattern of trying to curtail this public airport's operations without compliance with federal law. This Court should not countenance that conduct.

Each preliminary-injunction factor favors relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). HeliFlite is likely to succeed on the ANCA claims addressed in Points II and III. Without relief, it faces loss of its Airport operating facilities, interruption of reliable service, and irreparable injury to customer relationships and goodwill. HeliFlite Decl. ¶¶ 50, 58; *see* Point V below. Preserving the existing operation pending adjudication avoids that harm without deciding permanent lease rights. The public interest also extends beyond HeliFlite: closure would displace general-aviation tenants, reduce transient ramp capacity, and eliminate an actual source of after-

hours ground services. *Id.* ¶¶ 13–14, 40–41; *see* Point VI below. HeliFlite therefore requests emergency relief maintaining its existing operational access during this action—restraining the Town from removing HeliFlite or its property from the Executive Terminal or Executive Ramp, from closing, decommissioning, demolishing, or repurposing those facilities so as to prevent HeliFlite's existing operations, and from enforcing Town Code § 75-12 against HeliFlite in the resulting reduced-facility setting without the process ANCA and Part 161 require.

## FACTUAL BACKGROUND

The relevant facts are set forth in the accompanying Declaration of Kurt Carlson ("HeliFlite Decl.") and the Declaration of Randy M. Mastro and its exhibits ("Mastro Decl."). HeliFlite seeks to preserve its existing operations at East Hampton Airport (the "Airport") against the combined effects of terminal closure, nighttime service restrictions, and capacity-constraining ramp requirements.

### A. The Parties and the Airport

HeliFlite is a Delaware limited liability company with its principal office at 165 Western Road, Kearny, New Jersey 07032. Founded in 1998, it provides on-demand helicopter charter services throughout the Northeast, including New York, New Jersey, Pennsylvania, and Connecticut. Its fleet includes Sikorsky S-76 and Agusta/Leonardo AW139 helicopters, and it employs 51 people. HeliFlite offers a HeliCard prepaid flight-hour program providing immediate booking access at locked-in prices and a fractional-ownership program used by Airport customers. HeliFlite holds FAA Part 135 certification and Department of Transportation authorization to engage in interstate air transportation, and operates Stage 2 aircraft. HeliFlite Decl. ¶¶ 3–7.

The Town of East Hampton (the "Town") owns and operates the Airport, a public-use airport serving fixed-wing and rotary-wing aircraft. The Town Board of the Town of East Hampton (the "Town Board") adopted the operating measures described below. Defendant Kathee Burke-

Gonzalez is sued in her official capacity as East Hampton Town Supervisor; HeliFlite's request to provide FBO services was presented to her in June 2024. HeliFlite Decl. ¶ 45. LIA operates the Executive Terminal at 50 Industrial Road, Wainscott, New York (the "Executive Terminal") and its associated ramp (the "Executive Ramp"), serving HeliFlite, based general-aviation tenants, and transient users. Its services include hangar and ramp access, passenger facilities, parking, and ground handling, but not fueling. Sound Aircraft Services, Inc. ("Sound") operates the other FBO. Closure would eliminate one of two terminal/FBO operations and its associated ramp access. Mastro Decl. Ex. 5, at 2; HeliFlite Decl. ¶¶ 11, 39.

### B. HeliFlite's Longstanding Operations at the Airport

The Airport has long been HeliFlite's most important destination. In 2025, HeliFlite flew 1,342 flights to or from the Airport, counting each landing and takeoff separately. Those operations represented between 20 and 23 percent of HeliFlite's total annual revenue, and approximately 87 percent occurred during the summer season from May through September. In 2026 year-to-date, HeliFlite has had 1,840 Executive FBO operations, expected to account for between 22 and 25 percent of its full-year 2026 revenue, with approximately 89 percent occurring during the summer months. Of those 1,840 operations, 60 involved locations outside New York. Many customers own homes in East Hampton but work in New York City or elsewhere and use HeliFlite's charter and fractional-ownership services as their primary means of traveling to and from those homes. HeliFlite depends on the Executive Terminal's hangar space, passenger facilities, parking, and ground handling to provide that service. HeliFlite Decl. ¶¶ 9–11.

HeliFlite requires its pilots to follow the Airport's noise-abatement procedures by maintaining high-altitude approaches, climbing quickly to high altitude on departure, and avoiding rotor operation for more than five minutes while on the ramp, except when air traffic control directs otherwise or weather-related safety conditions prevent compliance. HeliFlite maintains

compliance-monitoring policies and procedures, and Carlson personally monitors compliance. HeliFlite Decl. ¶ 8.

The Executive Terminal is not a facility used by HeliFlite alone. LIA serves twelve tie-down tenants and additional transient aircraft during the summer. Its ramp contains approximately thirteen tie-down positions. The Town has made no plan or equivalent accommodation to relocate those users if the Executive Terminal and its ramp close. Moving the based aircraft to Sound would consume positions otherwise used by arriving and transient aircraft rather than recreate the eliminated capacity. HeliFlite Decl. ¶¶ 13–14.

Sound currently advertises hours of 8:00 a.m. to 7:00 p.m. daily, with after-hours fuel inquiries available only by text message, and does not service the Executive Terminal. Unlike the Executive Terminal, which has accommodated HeliFlite's aircraft without a reservation system, Sound allocates its limited ramp and parking positions through a Prior Permission Required ("PPR") system that assigns operators specific arrival and departure windows, particularly during peak summer periods. HeliFlite Decl. ¶¶ 11–12. HeliFlite has historically needed to use Sound's services infrequently, and because of HeliFlite's past experience with Sound's limited ramp and parking capacity and its use of assigned arrival and departure windows, HeliFlite does not expect Sound to be able to accommodate its existing volume of peak-period operations in addition to Sound's current traffic. *Id.* Without LIA's services or a replacement FBO, HeliFlite could not continue its Executive Terminal operations, including operations outside Sound's limited daytime hours and operations exceeding Sound's available capacity. HeliFlite Decl. ¶¶ 11, 44. Nor do nearby airports provide equivalent access for HeliFlite's East Hampton customers: Montauk is approximately 20 miles east of the Airport and provides no fueling services; Southampton has one helipad, provides no fueling services, permits helicopters to remain on the helipad for no more

than five minutes, and operates only from sunrise to sunset; and Gabreski is more than 25 miles west of the Airport and requires additional ground travel on Route 27, which is heavily congested during the summer. *Id.* ¶ 54. That ground travel would undermine HeliFlite's traffic-avoidance benefit, and Carlson expects many customers would forgo flying if the final leg still involved substantial traffic. Carlson also anticipates that displaced traffic could exceed the alternative facilities' capacity, particularly at Southampton's single helipad, requiring helicopters to hold over the bay and creating additional noise and operational safety concerns. *Id.* ¶¶ 55–56.

In June 2024, HeliFlite's Chief Executive Officer, Kurt Carlson, met with Supervisor Burke-Gonzalez and asked that HeliFlite be allowed to provide FBO services. By letter dated October 26, 2026, addressed to Supervisor Burke-Gonzalez and the Town Board, Carlson formally renewed that request and separately asked the Town to forbear from proceeding with eviction while the parties' negotiations over FBO service were ongoing. HeliFlite Decl. Ex. 5. By letter dated October 28, 2026, Supervisor Burke-Gonzalez responded that the Town is "happy to explore HeliFlite serving as a second FBO" only if HeliFlite changes its business model to serve all Airport operators, and asserted that HeliFlite has not submitted an application satisfying the Town's minimum standards for aeronautical service providers. HeliFlite Decl. ¶ 46; HeliFlite Decl. Ex. 6. The Town's response did not address, let alone grant, HeliFlite's request that the Town forbear from eviction pending those negotiations. *Id.* The Town's response further stated that a second FBO "likely would not necessarily be based at the Executive Terminal" but would instead be located elsewhere in the Airport's northern portion—confirming that, even on the Town's own telling, the Executive Terminal itself would not continue as an operating FBO facility. *Id.* HeliFlite thus sought an operating alternative rather than merely insist upon LIA's continued tenancy; the Town's response confirms no replacement FBO arrangement is currently in place at the Executive

Terminal, and that the Town does not intend the Executive Terminal to continue serving that function at all.

### C. The Town's 2015 Curfew Restrictions and the *Friends* Litigation

In April 2015, the Town adopted three local laws imposing an 11:00 p.m.–7:00 a.m. mandatory curfew, an 8:00 p.m.–9:00 a.m. extended curfew for aircraft classified by the Town as "Noisy Aircraft," and a one-round-trip-per-week summer limit for that category. HeliFlite Decl. ¶ 15. HeliFlite and other Airport users challenged those restrictions in *Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, No. 15-cv-2246 (E.D.N.Y.). *See Friends*, 841 F.3d at 138–40.

The Second Circuit held that ANCA's procedural mandates apply to public-airport proprietors without regard to their eligibility for federal funding and that private plaintiffs may seek equitable relief against noncompliant local restrictions. It affirmed the injunction against the weekly flight limit, reversed the denial of preliminary relief against the curfews, and remanded for further proceedings. *Friends*, 841 F.3d at 143–52, 155. The central holding was that the Town could not implement covered noise or access restrictions without undertaking ANCA's required procedures.

### D. The FAA Grant Assurance Proceeding (Docket No. 16-15-02)

Separately from the 2015 federal action, HeliFlite and other Airport users filed an administrative complaint with the FAA on January 29, 2015, captioned *Friends of East Hampton Airport, Inc. et al. v. Town of East Hampton, NY*, FAA Docket No. 16-15-02. The FAA bifurcated that proceeding and, on January 31, 2017, issued a Director's Determination on uncontested claims concerning pavement maintenance, non-aeronautical lease revenues, and reimbursements to the Airport Fund. It found violations of Grant Assurances 11, 24, and 25 and required corrective action. Mastro Decl. Ex. 1. That administrative proceeding was distinct from the federal-court litigation.

The FAA's December 1, 2023 determination disposed of the contested claims. It dismissed allegations involving Grant Assurances 19, 20, 24, and 29 as moot because the relevant grant obligations expired September 25, 2021, and concluded that the revenue allegations had been addressed in the Town's 2017 corrective-action plan. The determination separately identified Assurances 23 (Exclusive Rights), 25 (Airport Revenues), and 30 (Civil Rights) as continuing for so long as the facility operates as an airport. Mastro Decl. Ex. 2, at 2. This history does not establish current breach of every assurance or make all grant conditions perpetual. ANCA's independent procedural requirements remain the basis of the judicial claims here, while any continuing exclusive-rights obligation presents a distinct FAA issue.

**E. The Town's 2022 Attempt to Convert the Airport to Private Use**

On January 20, 2022, as amended February 17, 2022, the Town Board adopted resolutions authorizing the deactivation of the Airport as a public-use facility on May 17, 2022, and its reopening as a private-use, permission-required airport on May 19, 2022. *Matter of E. End Hangars*, 225 A.D.3d at 863. Contemporaneously, on April 21, 2022, the Town Board adopted Local Law No. 11-2022, which repealed the Town's then-existing, detailed Airport Code—including provisions corresponding to the current Sections 75-12 and 75-20 discussed below—and replaced it with an abbreviated chapter declaring the Airport a privately operated, permission-only facility whose operating rules would thereafter be set by separately maintained, non-codified rules and regulations.

Airport users challenged the Town's attempted conversion in three related hybrid Article 78 proceedings and actions for injunctive relief. The Second Department upheld the determination that the Town's action was arbitrary and capricious and affected by an error of law because it failed to comply with ANCA. It modified the injunction to prohibit closure or deactivation based on the January and February 2022 resolutions, rather than all possible future closure decisions. *Matter of*

*E. End Hangars, Inc. v. Town of E. Hampton*, 225 A.D.3d 861, 864–65 (2d Dep't 2024). In the companion contempt appeal, the court sustained the finding that the Town had violated clear mandates by taking steps toward closure and enforcing new use restrictions, but rejected other contempt grounds and modified the monetary sanctions. 225 A.D.3d 865, 868–70 (2d Dep't 2024). HeliFlite invokes this history as relevant context, not as a prior adjudication that the particular eviction now at issue violates those orders.

On November 7, 2024, the Town filed FAA Form 7480-1 requesting that the Airport be formally converted back to public use, which the FAA granted on February 20, 2025.

**F. The LIA Lease Termination and Litigation**

LIA litigated its lease rights in *Long Island Airline, LLC v. Town of East Hampton*, Index No. 618836/2021 (Sup. Ct., Suffolk Cnty.). An April 19, 2022 order denied *Yellowstone* relief after finding an incurable material breach; the Second Department affirmed and the Court of Appeals denied leave. A later order upheld the Town's service of the termination notice and dismissed LIA's remaining claims. Mastro Decl. Ex. 5, at 3. HeliFlite does not ask this Court to reconsider those lease determinations or to award LIA a renewed tenancy.

The Town served a termination notice in February 2024 and commenced an eviction proceeding in the East Hampton Justice Court, *Town of East Hampton v. Long Island Airline LLC f/k/a Aviation Resources Inc. et al.*, Index No. LT 30281/2024. The Justice Court's August 1, 2025 decision awarded possession; the warrant attached to the Sheriff's later notice is dated August 26, 2025. It commands removal of LIA and several fictitiously named corporate and individual respondents from the entire commercial premises. The Appellate Term dismissed the appeal from the August 1 decision on December 22, 2025. Mastro Decl. Ex. 4; HeliFlite Decl. Ex. 1.

### G. HeliFlite's Article 78 Proceeding and Its Dismissal

On May 22, 2024, HeliFlite commenced its own Article 78 proceeding, *HeliFlite Shares, L.L.C. v. Town of East Hampton*, Index No. 612657/2024 (Sup. Ct., Suffolk Cnty.). A November 12, 2025 order to show cause stayed enforcement while that proceeding remained pending. Mastro Decl. Ex. 5.

By decision and order dated September 21, 2026, and filed September 24, 2026, Justice Whelan denied HeliFlite's petition, dismissed the proceeding, vacated the November 12 stay, and directed submission of a judgment on notice. The court concluded that the lease-termination issue had already been decided and was dispositive of HeliFlite's petition. Mastro Decl. Ex. 5, at 1, 3–4. This Court is not asked to reverse that conclusion. The question presented here is whether the Town's challenged restrictions on covered aircraft operations may be implemented without ANCA compliance, subject to the distinct jurisdictional and preclusion issues addressed in Point IV.

### H. The Current Nighttime Curfew and the Town's Own Admissions Regarding FBO Availability

The Town's July 17, 2026 Operating Procedures memorandum states: "Nighttime Curfew: 10pm to 7am." Its Airport Information sheet, dated May 11, 2026, states: "Curfew: All Aircraft----Nighttime Curfew: 10:00pm to 7:00am. No FBO services available during those hours." HeliFlite Decl. Exs. 2, 4.

The Town's March 23, 2026 Helicopter Arrival and Departure Routes publication states: "East Hampton Airport Curfew: 2200L - 0700L. No ramp services are available during those hours." HeliFlite Decl. Ex. 3, at 5. In practice, however, LIA and the Executive Terminal have supported safe operations and services outside the Town's published 10:00 p.m.–7:00 a.m. interval. HeliFlite Decl. ¶ 40. Eliminating that actual service would make the published nighttime limitation an effective barrier to operations that can presently continue. Usable parking and ground-handling

arrangements are important for safe passenger access and aircraft movements after 10:00 p.m., including arrivals delayed by weather or air-traffic instructions. Eliminating the Executive Terminal's after-hours services would remove those arrangements. *Id.* ¶¶ 40–41. The Town has not undertaken the applicable Part 161 process for the published curfew or its compulsory implementation through elimination of after-hours access.

### I. Town Code Section 75-12 and Peak-Period Capacity

Town Code § 75-12 provides: "Unless otherwise approved by the airport manager, passengers must be enplaned and deplaned in designated areas with aircraft engines shut off." Mastro Decl. Ex. 6. Section 75-20 separately prohibits fueling while an aircraft's engine is running. *Id.* The July 2026 memorandum directs operators to limit ramp engine run time for "environmental and noise considerations," limits APU run time to 30 minutes, and refers to Code penalties. HeliFlite Decl. Ex. 2. Chapter 75 authorizes fines and other enforcement measures. Mastro Decl. Ex. 6. With the Executive Terminal's ramp unavailable, relocating based aircraft to Sound would consume positions presently used for arriving and transient aircraft. Requiring shutdown and restart cycles for passenger handling would further lengthen occupancy of those limited positions and reduce the covered operations that can be accommodated. HeliFlite Decl. ¶ 57.

### J. The Imminent Eviction and Present Emergency

On October 14, 2026, the Suffolk County Sheriff served a 14-day eviction notice accompanied by the August 26, 2025 warrant in Index No. LT 30281/2024. HeliFlite Decl. Ex. 1. The notice advises that removal will occur without further notice after expiration of the stated period. HeliFlite seeks relief before that period expires on or about October 28, 2026; the notice does not itself identify a scheduled hour of execution. Because the warrant covers the entire premises and includes fictitiously named occupants, its execution threatens HeliFlite's personnel, aircraft, equipment, and other property as well as LIA's possession. *Id.* The immediate objective is

to preserve HeliFlite's existing operational access while the Court decides the application, rather than permit removal and terminal closure to establish a new operating baseline.

After dismissal of HeliFlite's petition, the Town took physical measures to restrict access to the Executive Terminal and Executive Ramp; one flight was directed to pick up its passengers at the main terminal on October 2, 2026, though the Town subsequently said the blockage was a mistake. HeliFlite Decl. ¶ 34.

HeliFlite intends to initiate a proceeding before the FAA under 14 C.F.R. Part 161 challenging the Town's curtailment of Airport access described above, should the parties be unable to resolve this dispute amicably. Any such administrative proceeding would be distinct from the 2015 grant-assurance proceeding, FAA Docket No. 16-15-02, described above. HeliFlite seeks judicial protection preserving its existing operations while this action is adjudicated, because the administrative process does not provide relief before the Executive Terminal is closed.

## ARGUMENT

### I. The Standard for a Temporary Restraining Order and Preliminary Injunction

A plaintiff seeking a TRO or preliminary injunction must establish likely success on the merits, likely irreparable harm, a favorable balance of equities, and consistency with the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The governmental equities and public interest are considered together. *Nken v. Holder*, 556 U.S. 418, 435 (2009). HeliFlite proceeds on likelihood of success, not merely serious questions. An injunction altering the *status quo* or requiring affirmative action may require a clear or substantial likelihood of success. *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33–35 (2d Cir. 1995). The *status quo* is the last actual, peaceable, uncontested status preceding the controversy, not simply the legal position following an intervening ruling. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37–38 (2d Cir. 2018). HeliFlite seeks to prevent physical displacement and loss of its existing

operating facilities, not compel a new lease. Its actual operations have continued despite vacatur of the prior stay, apart from the temporary blockage described above. HeliFlite Decl. ¶ 34. To the extent particular service or access provisions require affirmative action, HeliFlite seeks that relief on the clear or substantial likelihood showing made in Points II and III.

## II. ANCA and Part 161 Displace Local Control Over Noise and Access Restrictions on Covered Aircraft Operations

The federal aviation framework constrains local restrictions on aircraft operations while preserving a defined role for airport proprietors. The question here is not whether the Town owns its Airport, but whether the restrictions it implements comply with the federal conditions governing that proprietary role. *Friends*, 841 F.3d at 147–52. ANCA supplies the specific procedural rule for the covered noise and access restrictions challenged in this action.

Federal law permits reasonable, nonarbitrary, nondiscriminatory proprietary regulation, but ANCA imposes additional procedural conditions on covered noise or access restrictions. *Friends*, 841 F.3d at 147–52; *Nat'l Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81, 88–92 (2d Cir. 1998). The Town cannot avoid those conditions by describing an operational restriction as management of ground facilities. For HeliFlite's Stage 2 operations, the applicable conditions are the advance notice, analysis, public-comment, and timing requirements of 49 U.S.C. § 47524(b) and Subpart C of Part 161.

ANCA establishes a national program for reviewing airport noise and access restrictions. The restrictions challenged here affect HeliFlite's Stage 2 aircraft operations and are governed by 49 U.S.C. § 47524(b) and Subpart C of Part 161, 14 C.F.R. §§ 161.201–161.215. That process requires analysis of the restriction, public notice, and an opportunity for comment, with the required notice and analysis completed at least 180 days before the restriction becomes effective.

*Id.* § 161.203(a). HeliFlite's claim is that the Town has not completed those mandatory procedures, not that a Stage 2 restriction requires advance FAA approval.

Subpart C's prohibition on implementation before compliance is explicit:

> An airport operator may not implement a Stage 2 restriction within the scope of § 161.201 unless the airport operator provides an analysis of the proposed restriction, prepared in accordance with § 161.205, and a public notice and opportunity for comment as prescribed in this subpart. The notice and analysis required by this subpart shall be completed at least 180 days prior to the effective date of the restriction.

14 C.F.R. § 161.203(a). A covered Stage 2 restriction may not be implemented unless the airport operator first completes the prescribed notice, analysis, and comment process, including the 180-day advance requirement. The Town has not completed that process for the challenged restrictions. Implementation through terminal closure, eviction, or application of a ramp rule does not dispense with those procedural obligations.

Part 161's definition of noise or access restrictions encompasses restrictions implemented through ordinances, regulations, leases, and airport-use agreements, including restrictions affecting the number or hours of covered aircraft operations. 14 C.F.R. § 161.5; *see also id.* § 161.203(c)(5) (identifying a lease as a possible method of implementation). Section 161.7(a) likewise subjects otherwise excluded noise-abatement procedures, such as taxiing and engine runups, to Part 161 when they limit the total number or hours of Stage 2 operations, as alleged here. The Town's use of proprietary and ramp-management measures therefore does not insulate the resulting restriction on HeliFlite's operations from ANCA.

In *Friends*, the Second Circuit recognized the availability of prospective equitable relief against the Town's ANCA-preempted restrictions without requiring exhaustion of an FAA remedy. 841 F.3d at 143–47. It also held that ANCA's mandatory and comprehensive procedures constrain the proprietor authority otherwise preserved by federal aviation law. *Id.* at 147–52. This Court can

enforce the Stage 2 procedural boundary by preventing implementation before the required notice, analysis, and comment process has occurred. The Second Department likewise rejected primary-jurisdiction deferral where the question was whether this Town had to comply with ANCA, rather than an issue requiring the FAA's technical competence. *E. End Hangars*, 225 A.D.3d at 864–65.

The closest recent appellate analogy is *Delux Public Charter, LLC v. County of Westchester*, No. 24-1895-cv (2d Cir. Aug. 26, 2025) (summary order). There the Second Circuit held that a new requirement forcing passenger operators from FBO areas into the main terminal limited aircraft operations and was not protected by ANCA's grandfather provisions. *Id.*, § I. That nonprecedential order supports examining the operational consequences of facility-allocation measures, even though this case concerns closure rather than an identical terminal-use ordinance. Importantly, *Delux* rejected the separate Airline Deregulation Act ("ADA") preemption challenge under the proprietor exception. *Id.*, § II. HeliFlite therefore does not assume that success under ANCA automatically establishes an independent ADA violation. *See also Nat'l Helicopter*, 137 F.3d at 88–92 (addressing the scope and limits of proprietary regulation).

## III. <u>HeliFlite Is Likely to Succeed on the Merits of Its ANCA Preemption Claims</u>

### A. Eliminating the Executive Terminal and Its Services Restricts HeliFlite's Access to the Airport

The Town's lease termination, threatened removal of HeliFlite, and closure of the Executive Terminal would eliminate facilities and services on which covered operations depend. They would also eliminate the terminal's ramp positions and displace based aircraft and transient traffic, including traffic that consumes space needed by covered helicopter operations. HeliFlite Decl. ¶¶ 13–14, 40–41. The access claim therefore reaches both HeliFlite's direct exclusion and the resulting operational-capacity reduction. It also challenges the Town's giving its published 10:00 p.m.–7:00 a.m. curfew compulsory effect over covered operations without Part 161

compliance. HeliFlite Decl. Exs. 1–4. The published limitation cannot be made enforceable merely by eliminating the after-hours facilities and services that have allowed operations to continue.

An open runway and a remaining FBO do not replace usable ramp positions, aircraft parking, passenger handling, and ground services. Nor can based aircraft simply move to Sound without occupying space available for arriving and transient aircraft. HeliFlite Decl. ¶¶ 13–14. The Town has provided no relocation plan or equivalent accommodation. Although the Town responded to HeliFlite's request to provide FBO services by offering to explore a second FBO subject to stated conditions, that response does not establish a replacement FBO arrangement at the Executive Terminal. *Id.* ¶¶ 14, 46–47. Those facts distinguish an actual loss of operational access from a change in facility management that leaves capacity and service intact.

*Delux* illustrates why a measure labeled terminal management may still restrict covered operations. There, the Second Circuit examined the operational consequences of requiring passenger operators to move from FBO areas to the main terminal. *Delux Public Charter, LLC v. County of Westchester*, No. 24-1895-cv, § I (2d Cir. Aug. 26, 2025) (summary order). Here, the Town is eliminating usable terminal and ramp space and the actual source of after-hours services. Relocating aircraft to the remaining ramp displaces other users; eliminating nighttime handling prevents operations that previously continued. HeliFlite Decl. ¶¶ 14, 40–41. That effect, not the label attached to a lease transaction, is the ANCA question.

The Town may characterize closure as ordinary facility management without a noise motive. But Part 161 expressly addresses covered operational limits implemented through leases and airport-use arrangements, and the claim here rests on the resulting loss of access and capacity. 14 C.F.R. § 161.5. The Town's prior ANCA disputes supply context; the present loss of ramp positions and after-hours service supplies the concrete restriction of HeliFlite's Stage 2 operations.

The Town has not completed the advance notice, analysis, and comment process required by § 161.203(a), including the 180-day requirement.

**B. Section 75-12, as Applied After Terminal Consolidation, Restricts Covered Operational Capacity**

The threatened capacity loss has two related components. First, closing the Executive Terminal's ramp concentrates additional aircraft at Sound's facilities, with relocated aircraft occupying positions otherwise available for arriving and transient aircraft. Unlike the Executive Terminal, Sound allocates its limited ramp and parking positions through a Prior Permission Required ("PPR") system that assigns operators specific arrival and departure windows, particularly during peak summer periods. Based on HeliFlite's past experiences with Sound, Sound's limited capacity, and its assigned windows, Carlson does not expect Sound to be able to accommodate HeliFlite's existing volume of peak-period operations in addition to Sound's current traffic. HeliFlite Decl. ¶ 12. Second, applying § 75-12's shutdown requirement for passenger handling in that reduced-space environment requires HeliFlite's helicopters to occupy the remaining positions during shutdown and restart cycles, lengthening turnaround times and reducing the flights accommodated during peak periods. HeliFlite Decl. ¶ 57. HeliFlite's customers have complained frequently since 2022 about delays associated with implementation of the engine-shutdown requirement. *Id.* ¶ 25. Section 161.7(a) subjects operational procedures to Part 161 where they limit the total number or hours of Stage 2 operations. HeliFlite challenges that additional limitation, not a theoretical percentage reduction derived merely from having one rather than two terminals.

Section 75-12's airport-manager approval provision does not establish that an exception would preserve HeliFlite's operations. Carlson is unaware of any published standard governing when the airport manager will grant or deny an exception. HeliFlite Decl. ¶ 24. His testimony

describes the capacity restriction resulting from application of the shutdown requirement in the reduced-space environment. *Id.* ¶ 57. The Town cannot invoke its safety or proprietary responsibilities to dispense with ANCA's required procedures when its implementation of the rule limits covered operations. The requested protection preserves safe operations while preventing the Town from using ramp requirements and terminal consolidation to impose an access restriction without federal procedural compliance.

## IV. The Court Can Adjudicate the Independent Federal Claims, Subject to the Limits Governing State-Court Enforcement

### A. HeliFlite Has Standing to Bring This Action

HeliFlite seeks relief for its own imminent exclusion and loss of capacity, not merely injury to LIA or to other tenants. Closure directly removes the facilities and services HeliFlite uses; relocation of the other based aircraft also consumes space needed for HeliFlite's arriving and departing flights. The temporary access blockage and diverted pickup described in the factual background demonstrate how that injury would occur. HeliFlite Decl. ¶ 34. The same measures affect other general-aviation users, reinforcing the public and airport-wide character of the restriction, while HeliFlite's standing rests on its own operational and business injury.

The injury is concrete and imminent because execution may occur after the current notice period. It is traceable to the Town's decision to pursue removal and implement the challenged facility and operating restrictions. An injunction preventing the Town from causing HeliFlite's removal and rendering the Executive Terminal unavailable would preserve HeliFlite's existing operational access while the merits are decided. HeliFlite Decl. Ex. 1; HeliFlite Decl. ¶¶ 50, 58.

### B. Proprietor Authority Does Not Excuse ANCA Noncompliance

The Town retains authority to enforce lawful lease terms and adopt reasonable, nonarbitrary, nondiscriminatory proprietary measures. *Nat'l Helicopter*, 137 F.3d at 88–92. But

the proprietor authority preserved by 49 U.S.C. § 41713(b)(3) does not dispense with ANCA's separate procedures for covered noise or access restrictions. *Friends*, 841 F.3d at 147–52. In *Delux*, the Second Circuit rejected the separate ADA challenge under the proprietor exception while finding the terminal-use restriction preempted under ANCA. No. 24-1895-cv, §§ I–II (summary order). Section 41713 supplies the proprietor-authority framework here; HeliFlite's asserted judicial preemption claim rests on ANCA and Part 161, not a separate ADA claim.

Grandfathering does not insulate a new operational restriction merely because the Town invokes an older rule. ANCA's preservation of preexisting law is expressly subject to § 47524. 49 U.S.C. § 47533(1). Part 161 exempts a subsequent amendment to a noise or access agreement or restriction in effect on November 5, 1990, only where the amendment does not reduce or limit aircraft operations or affect aircraft safety. 14 C.F.R. § 161.7(b)(4). Subpart C likewise applies to an amendment to a Stage 2 restriction proposed after October 1, 1990, if it reduces or limits Stage 2 operations compared with the restriction it amends or affects aircraft safety. *Id.* § 161.201(a)(2). In *Delux*, the Second Circuit examined the additional operational limitation imposed by a terminal-use requirement rather than accepting the County's characterization of its historical policy. No. 24-1895-cv, § I (summary order). Here, HeliFlite challenges the present combination of terminal elimination and ramp restrictions, which would foreclose its Stage 2 operations that can continue under the existing facilities and service arrangements. HeliFlite Decl. ¶¶ 11, 40–41, 57. The age of the Code's engine-off language does not, by itself, grandfather that additional restriction.

### C. *Montauk-Caribbean Airways v. Hope* Does Not Bar This Action

*Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 94–98 (2d Cir. 1986), does not resolve this action. HeliFlite seeks protection against a restriction on covered aircraft operations implemented without ANCA compliance, not an adjudication of permanent lease rights. *Montauk-Caribbean* predates ANCA, whereas *Friends* directly addresses the later statute's constraint on the

Town's proprietary authority. The requested injunction preserves existing operations while that independent federal question is adjudicated.

The FAA's FBO-access decisions likewise recognize that proprietary transactions do not immunize an airport's access decisions from applicable federal duties. In *Smith v. Okaloosa County, Florida*, FAA Docket No. 16-24-01, Director's Determination at 17–20 (Mar. 20, 2025), the FAA found grant-assurance violations where lease transactions concentrated both FBO locations in one company and excluded a prospective provider without suitable alternative accommodation. In *Mansfield Heliflight, Inc. v. City of Burlington, Vermont*, FAA Docket No. 16-14-06, Director's Determination at 26–29 (Sept. 5, 2017), the FAA found no violation where alternative development space was offered and the applicant failed to supply a sufficiently clear business plan. Although arising under grant assurances, those decisions reinforce the distinction relevant here: genuine access to alternative facilities, rather than the form of the proprietary transaction. The Town's elimination of the facilities on which HeliFlite depends leaves no workable substitute for its Airport operations. HeliFlite Decl. ¶¶ 50, 54.

The FAA's 2023 determination expressly identified Exclusive Rights Assurance 23 as continuing while the Airport operates. Mastro Decl. Ex. 2, at 2. HeliFlite requested permission to provide FBO services in June 2024 and renewed that request on October 26, 2026. The Town's October 28 response offered to explore a second FBO subject to stated conditions and asserted that HeliFlite had not submitted an application satisfying the Town's minimum standards; it did not establish a replacement operating arrangement. HeliFlite Decl. ¶¶ 45–46. Consolidating both terminal operations under Sound while excluding a qualified alternative provider would raise the administrative access concerns addressed in *Smith*, requiring examination of the actual service, access, and capacity arrangements. The continuing exclusive-rights issue belongs in the

appropriate FAA process; it reinforces the access analogy but is not asserted here as a separate private cause of action under Grant Assurance 23. The judicial ANCA issue remains the restriction of covered operations without the applicable process.

### D. The Prior State Proceedings Do Not Foreclose Adjudication of HeliFlite's Independent Federal Claims

HeliFlite's claim is independent of the state court proceedings between the Town and LIA. The September 2026 decision dismissed HeliFlite's own Article 78 proceeding on collateral-estoppel grounds; it did not adjudicate the federal preemption claim HeliFlite brings here. Mastro Decl. Ex. 5. That claim challenges the Town's present restriction of covered aircraft operations through loss of ramp capacity and after-hours access—an injury to HeliFlite's own federal operating rights that exists independently of, and was not before any state court in, the lease and eviction proceedings between the Town and LIA, to which HeliFlite was not a party. *See Hale v. Bimco Trading, Inc.*, 306 U.S. 375, 377–78 (1939); *County of Imperial v. Munoz*, 449 U.S. 54, 59–60 (1980).

None of the preclusion or abstention doctrines the Town might invoke changes that conclusion. *Rooker-Feldman* bars only suits by state-court losers seeking federal review and rejection of a state judgment; HeliFlite does not ask this Court to overturn the lease rulings or sit in appellate review of the Article 78 decision, but only to enjoin the Town's ongoing, independent restriction of covered aircraft operations. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 292–93 (2005); *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85–88 (2d Cir. 2005). Nor does claim preclusion apply: under 28 U.S.C. § 1738, this Court gives the state adjudications the effect New York would give them, *Whitfield v. City of New York*, 96 F.4th 504, 522–29 (2d Cir. 2024), but a claim is not precluded merely because a related legal theory could

have been raised earlier, where—as here—the claim rests on subsequent, independent conduct and injury. *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 499–502 (2d Cir. 2014).

*Younger* abstention is likewise confined to exceptional categories not present here—this is not a criminal or quasi-criminal enforcement action against HeliFlite, and HeliFlite's facility-access claim does not interfere with the Town's ability to enforce its judgment against LIA, unlike the injunction against execution and security procedures at issue in *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 10–14 (1987). *See Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 78–82 (2013). And *Colorado River* abstention, reserved for exceptional circumstances given the federal courts' virtually unflagging obligation to exercise jurisdiction, has no application where, as here, no parallel state proceeding raises HeliFlite's federal claim. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–18 (1976). The Town's pursuit of possession against LIA does not warrant deferral of HeliFlite's independent federal claims.

### E. This Action Is Neither Moot Nor Unripe

The current dispute is ripe because the Town has obtained possession relief and the Sheriff has issued a notice allowing removal after the stated period. HeliFlite Decl. Ex. 1. HeliFlite need not wait until its personnel and property are removed and its Airport operations interrupted to challenge the threatened restriction. Nor does the existence of an eviction warrant eliminate the continuing federal controversy over Airport access. Immediate relief preserves the existing operating arrangements and prevents irreparable injury while the Court adjudicates that controversy.

## V. <u>HeliFlite Will Suffer Immediate and Irreparable Harm Absent an Injunction</u>

Absent relief, HeliFlite will lose the terminal and ramp facilities and ground services necessary to continue its established Airport operation. The temporary access blockage and diverted pickup already demonstrate how disruption occurs. HeliFlite Decl. ¶ 34. Customers

purchasing reliable East Hampton access through HeliCards, charter arrangements, and fractional interests cannot be served by permission to land without usable parking and passenger-handling facilities. The resulting canceled trips, lost renewals, and diversion of customers threaten lasting injury to goodwill and business continuity, beyond the price of individual flights. *Id.* ¶ 58. And the Second Circuit has made clear that "a loss of prospective goodwill can constitute irreparable harm." *Tom Doherty*, 60 F.3d at 37–38; *see also 3M Co. v. CovCare, Inc.*, 537 F. Supp. 3d 385 (E.D.N.Y. 2021) (citing *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010)); *Yong Ki Hong v. KBS Am., Inc.*, No. 05-CV-1177 ERKKAM, 2005 WL 1712236, at *2 (E.D.N.Y. July 22, 2005) (cleaned up). The removal of an actual source of safe after-hours handling further limits HeliFlite's ability to accommodate delayed flights and reliable return service. HeliFlite Decl. ¶¶ 40–41.

Eviction would leave HeliFlite's total revenue for 2027 10–15 percent lower than projected absent eviction. HeliFlite would likely have to reduce its fleet by approximately 3–4 helicopters and lay off 10–12 full-time employees. HeliFlite Decl. ¶¶ 52–53. Even if access were later restored, highly skilled employees would be difficult to replace, as would helicopters meeting HeliFlite's criteria for used, single-owner, high-quality aircraft. *Id.* ¶ 53. Approximately 89 percent of HeliFlite's 2026 year-to-date Executive FBO operations occurred during the summer months. *Id.* ¶ 9. Those figures demonstrate the scale of disruption; the irreparable injury is loss of an ongoing service capability and established customer relationships that a later payment for lost flights would not restore.

Many of HeliFlite's HeliCard customers and fractional owners frequently travel to and from the Airport. HeliFlite Decl. ¶ 5. Loss of reliable Airport service would cause loss of customer relationships, goodwill, and operational continuity that cannot simply be restored by a later

payment for missed flights. *Id.* ¶ 58. Nearby airports cannot adequately mitigate those injuries because of their location, capacity, operating hours, and service limitations. Requiring customers to land farther from East Hampton and complete their journeys over congested roads would undermine HeliFlite's traffic-avoidance benefit, and many customers would likely forgo flying. *Id.* ¶¶ 54–56.

The timing does not negate the present threat. The September decision vacated a stay, but HeliFlite's actual operations continued; the October 14 Sheriff's notice then supplied a concrete removal period ending on or about October 28. Mastro Decl. Ex. 5; HeliFlite Decl. Ex. 1; HeliFlite Decl. ¶¶ 33, 35. HeliFlite renewed its request to provide FBO services by letter dated October 26, 2026. HeliFlite Decl. ¶ 45. On October 27, counsel notified the Town of the intended October 28 action and emergency application and requested forbearance; the Town refused. Mastro Decl. ¶ 10; Mastro Decl. Ex. 10. The Supervisor's October 28 response offered to explore a second FBO subject to stated conditions, but did not establish a replacement arrangement at the Executive Terminal. HeliFlite Decl. ¶ 46; HeliFlite Decl. Ex. 6. HeliFlite now seeks protection before removal interrupts its continuing operations. Unlike delay while an unchanged injury is tolerated, the imminent physical displacement would create a new and immediate interruption of ongoing service. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir. 1985) (considering delay in evaluating claimed urgency).

## VI. <u>The Balance of Hardships and the Public Interest Favor an Injunction</u>

The balance of hardships favors preserving HeliFlite's existing operations. Without relief, HeliFlite faces immediate displacement, interruption of Airport service, loss of established customers, and lasting injury to its business. HeliFlite Decl. ¶¶ 50–58. By contrast, maintaining the *status quo* pending adjudication does not decide the Town's ultimate lease rights or prevent it from pursuing lawful management of its facilities. It preserves the operations that have long taken

place at the Executive Terminal while the Court resolves whether the Town may implement the challenged restrictions without ANCA compliance. Any temporary burden on the Town from that preservation is outweighed by the irreparable injury that loss of Airport access would inflict on HeliFlite.

The public interest extends beyond HeliFlite's private tenancy or revenue. The Executive Terminal supported 1,840 HeliFlite operations in 2026 year-to-date, compared with 1,342 Airport operations in 2025, counting each landing and takeoff separately. HeliFlite Decl. ¶ 9. It also serves other general-aviation users, including twelve tie-down tenants and additional transient aircraft during the summer, for whom the Town has made no relocation plan or equivalent accommodation. HeliFlite Decl. ¶¶ 13–14. Aircraft relocated from the Executive Ramp would occupy positions otherwise available for arriving and transient aircraft, and shutdown and restart cycles would further constrain peak-period capacity. *Id.* ¶ 57. Closure also removes actual after-hours services supporting safe passenger access and aircraft movements. *Id.* ¶¶ 40–41. These are concrete airport-wide capacity, continuity, and safety interests. The effect on general-aviation users supports the public-interest showing even where a particular user's aircraft is not independently covered by Part 161. The federal claim remains tied to the resulting restriction of covered operations. Preserving existing access while the required legal process is adjudicated serves those interests without deciding permanent lease rights.

## VII. <u>The Court Should Preserve HeliFlite's Existing Operations Pending Adjudication</u>

HeliFlite requests immediate, preliminary restraint, pending prompt hearing and determination, against Defendants, their officers, agents, employees, attorneys, and other persons properly bound under Federal Rule of Civil Procedure 65(d)(2), from: (a) taking any action that would alter HeliFlite's existing operations or cause the removal of HeliFlite, its personnel, aircraft, equipment, or other property from the Executive Terminal or the Executive Ramp; (b) closing,

decommissioning, demolishing, or repurposing the Executive Terminal or Executive Ramp so as to prevent HeliFlite's existing operations, blocking HeliFlite's established access to those facilities, or terminating its existing parking, passenger-handling, and actual after-hours ground-handling access and arrangements at those facilities; and (c) enforcing Town Code § 75-12 by requiring engine shutdown for passenger enplaning and deplaning by HeliFlite's Stage 2 helicopters following closure of the Executive Terminal and Executive Ramp, without compliance with 49 U.S.C. § 47524(b) and 14 C.F.R. Part 161, Subpart C, including the 180-day advance notice and analysis requirement. This requested restraint does not override applicable FAA safety requirements. The requested protection maintains HeliFlite's actual operations while the federal claims are adjudicated, subject to further order of the Court.

This relief is narrowly tailored to the restrictions HeliFlite challenges. It does not seek to vacate the warrant of eviction against LIA, restore LIA's tenancy, or adjudicate the lease rights at issue in the state court proceedings. It seeks only to preserve HeliFlite's own existing access, operations, and property at the Executive Terminal and Executive Ramp while this action is adjudicated.

## CONCLUSION

For these reasons, HeliFlite respectfully requests that the Court issue the Order to Show Cause and temporarily restrain Defendants, pending the hearing and determination of this application, from taking any action that would alter HeliFlite's existing operations or cause the removal of HeliFlite, its personnel, aircraft, equipment, or other property from the Executive Terminal or Executive Ramp. HeliFlite further requests a prompt preliminary-injunction hearing and an order preliminarily enjoining Defendants from: (a) altering HeliFlite's existing operations or removing HeliFlite or its property from the Executive Terminal or Executive Ramp; (b) closing, decommissioning, demolishing, or repurposing those facilities so as to prevent HeliFlite's existing

operations, blocking its established access, or terminating its existing parking, passenger-handling, and actual after-hours ground-handling access and arrangements; and (c) enforcing Town Code § 75-12 against HeliFlite's Stage 2 helicopters following closure of those facilities without the notice, analysis, and 180-day advance-compliance process that 49 U.S.C. § 47524(b) and 14 C.F.R. Part 161, Subpart C require, without overriding applicable FAA safety requirements. HeliFlite also requests such other and further relief as the Court deems just and proper.

Dated: New York, New York
October 28, 2026

DECHERT LLP

By: */s/ Randy M. Mastro*
Randy M. Mastro
randy.mastro@dechert.com
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036-6797
Telephone: +1 212 698 3500
Facsimile: +1 212 698 3599

*Counsel for Plaintiff*